May it please the court, my name is David Hagigi. I am counsel for Ms. Tandiono, who is present in the courtroom today. The main issue in this case is whether the evidence presented in the record before the court establishes a pattern or practice of persecution of ethnic Chinese Christians living in Indonesia. Now, pattern or practice has had a long history in this courtroom, notably as the government in their brief points out, the Lolong case. In Lolong, when the court reviewed the record before it, and it was reviewing the 1999 and the 2000 country reports, the court noted that the record there did not establish a pattern or practice of persecution. So the record here is looking at the 2005 country reports. And when the immigration judge who relied upon those country reports saw that pattern and practice had been established, the judge found that an applicant need not show that she would be individually singled out if the applicant established that pattern or practice existed in his or her country of persecution of a group of persons. Counsel, if we were to adopt your argument, does that mean that all ethnic Chinese Christian Indonesians would be eligible for asylum in the United States? No, Your Honor. I believe that what they would need to show is that they were involved within that particular group, that they could identify to that group, and that if the harm is to such an extent, they would not have to show individuality. Given the premise that I gave you, that doesn't seem terribly difficult to prove, right? If you can prove that you're an ethnic Chinese Christian Indonesian, that's not a terribly high burden to satisfy if you're Chinese Christian and are from Indonesia. Wouldn't that then, under your theory, entitle you to asylum in the United States? Is there something else that you would have to show? You would have to show no, Your Honor, not under the regulatory provision. So for example, all of your client's family would be eligible then for asylum in the United States? That's correct. Even if they hadn't been persecuted in Indonesia, even though they're living there now? Well, Your Honor, if I may respond to that. If the harm is so severe, then they wouldn't have to show that. So to answer your question, yes, Your Honor. Even if it hasn't happened to them yet, under the regulatory provision, the understanding is that it may happen to them at some point in the future. What's happened between our decision in Lolong and today that indicates that we should come to a different conclusion than we came to in Lolong? Well, Your Honor, the ---- Actually, what's in the record here? Right. I'm sorry. Just ---- I would just add an addition to Judge Bidey's question. What's in the record here that supports? Yes. What's happened between Lolong and today is that the Court has handed down the case of Tambabulan v. Holder. At the time when Lolong was handed down, the only case that existed was the Sayal case. So if you were included within the ethnic Chinese group, you were found to be a disfavored group member. Now we have an individual who is doubly persecuted, if you will, both as an ethnic Chinese and as a Christian. So the level of harm to that particular person is going to be greater. Your Honor had asked regarding what is in the record here. Well, after the judge found patent and practice of persecution, the BIA took a look at the record and they said because the government of Indonesia has expressed a desire or a willingness for or a commitment to religious freedom that there can't be patent or practice. Now, when you take a look at those same country conditions reports, you take a look that it says notably or significantly more churches were burned during that period than the period before. During which period? During which period? During the period of 2005. So in 2004, they had noted that there were 13 churches that were burned. And that's statistically about once every month. But during the 2005 period, there were 26 churches. That's one church every two weeks. That's significantly greater. Additionally, when you take a look at the 2005 International Religious Freedom Report, it also states that a court in Indonesia sentenced three Sunday school teachers to three years in prison based on proselytizing for their inclusion of Muslim school children, albeit with parental permission in Christian Sunday school activities. And if you take a look at the country conditions reports, there are over 60 articles of law, regulation, or decree that were in effect that discriminated against the ethnic Chinese. I'm having trouble trying to figure out how we had because we had three Sunday school teachers sentenced that all Chinese, ethnic Chinese, Christian Indonesians are now entitled to asylum in the United States. What I'm saying is that the government may, it's very easy to throw out words to say, we're committed to religious freedom. But if churches are being blown up, if Sunday school teachers are being placed in prison, if people have to resort to underground churches, and those are also being blown up, then what freedom of religion exists? So it goes across all members of the class. You have ethnic Chinese, Christians, that particular subgroup, the double persecuted subgroup, that are being persecuted. That is my argument. Your Honor. Did you want to save your three minutes for rebuttal? Okay. Thank you, Judge. May it please the Court. Rebecca Hoffberg Phillips on behalf of the United States Attorney General. Just want to clarify a few things that I think are getting a little bit hazy in this case. First of all, past persecution is not before the Court. I think everyone can agree on that. We're focusing on whether there's a well-founded fear of persecution. There's three different ways you can show a well-founded fear of persecution. You can show a pattern in practice, which as Judge Bybee pointed out, means the entire population is entitled to asylum on that theory. Or you could show individualized persecution that you yourself specifically would be targeted. Or you can show what this Court has designated a disfavored group analysis, where it's a sliding scale between the two. Before the immigration judge, Petitioner had one theory, which was the pattern and practice of persecution. Before the Board, she had no theory, because she didn't file anything before the Board. And before this Court, she has a different theory, which is a disfavored group analysis. Now, I want to go through very specifically each one of those things, because it's very important that, especially in terms of the disfavored group analysis, that that was not presented before the Board. And the Board, therefore, did not address the disfavored group analysis. When asked, Petitioner's counsel brought up Tampu Bolon, and that didn't impact Lolong in any way. I think Judge Bybee asked, how has Lolong changed since then? Well, I believe that you were going for, how is there now a pattern and practice of persecution? Tampu Bolon did address the disfavored group analysis, which is a different type of analysis. And I will get to later why. Didn't the Board say that she was relying on her status in a disfavored group? Actually, the Board's decision states that, like the applicant in Lolong, she has not suggested she faces an individualized threat of persecution. But since the Senate's, there's more to it. In her native country, and instead relies solely on her status as a member of a disfavored group. Right, well, basically, because she is part of a disfavored group, as this Court has found out, she is part of a disfavored group. We're not disputing, I mean, in terms of that analysis would apply, because she is an ethnic Chinese Christian, which this Court found in Sayal, and then built on that in Tampu Bolon, that she would qualify as part of that group. Whether she would actually qualify for asylum under that theory, she would have to show an individualized risk of persecution in addition to being a member of that group. So, what the Board, I believe, was saying is that she didn't allege that individualized risk. But the Board doesn't really go so far into the disfavored group analysis in terms of really getting specific, because it was never raised to the Board, and she never filed any appeal brief, or none of those responses. That was not a ruling by the Board that she failed under that analysis? Well, it is a ruling in the sense that she didn't show an individualized risk, such that what I was going to point out to the Court is that remand would probably be futile in this case, because the Board has used it. You seem to be suggesting that maybe it wasn't exhausted. It wasn't exhausted. But it was exhausted, wasn't it? Because the Board decided, the Board looked at it and decided it. If that happens, our case law says that the Petitioner doesn't need to, the exhaustion doctrine won't bar the argument. That's correct. To the extent that this Court found that the Board found that she didn't demonstrate her individualized risk under the disfavored group analysis, then the Court could find under those circumstances that it's sufficiently exhausted because the Board addressed it, and therefore shouldn't remand or, you know, send back to the extent that the Court feels the Board didn't sufficiently explain that part of its decision. Because it wasn't presented, it could remand for a better analysis of that. But our position is that it would be futile because she didn't show the individualized risk. If you look at each of her five incidents, each one of them is problematic in terms of showing an individualized risk. She's alleging things, especially in her written application, you can tell that the way that she frames her claim is as a general population as a whole. And that's what's problematic under the disfavored group analysis. You have to still show that individualized component. Now, in terms of what has changed since Lo Long, well, the government's position is that the country conditions, if anything, have improved since Lo Long, which already found improvement, you know, in the record in that case, which was even more outdated country reports. And, you know, many courts, many of the circuit courts have reviewed either the 2005 State Department report or more recent reports, and have all come to the same conclusion that it shows continuing improvement in Indonesia. Now, I think what I would like to point out here is that I know it can often be problematic when the immigration judge found a pattern in practice, and then the board found no pattern in practice. And I know, Judge Pais, you wrote the Brazilian decision about, you know, was there any impermissible fact finding? And so I'd like to address that so this court feels confident that the board didn't violate any rules by overturning that finding. The thing is, what the immigration judge didn't do was consider the unable and unwilling component in this case, which is a very important part of the persecution standard, that you have to be able to show that the government wasn't able to take any concrete steps toward curbing this ethnic and religious violence. And in this case, the immigration judge's decision doesn't once say the words unable and unwilling, which is part of a legal standard. And the board specifically says, and as this case, as this court decided in Lolong, that you must also show that component. That, I mean, it's written clearly in Lolong, and the board also says it, that alleging a pattern in practice, you must also prove that the government is unable and unwilling. And so there's numerous pages in the State Department report that show the government is actually able and willing. And unfortunately, the immigration judge's decision cherry picks a lot of the facts out without reading the sentences before and the sentences after that show exactly how the government took some steps in those cases. And I'd like to just point out for one, as an example, I can take you, I have every page for the immigration judge's decision. I found each page in the State Department report and basically found why there was sort of a problem with his legal analysis of it. A perfect example, as he says, in 2003, unknown assailants attacked the four villages in Poso. This is on page 68 of the record. And he points out that a military police force searched the surrounding forest and killed six suspects. Most of them were, most of the victims were Christian, and the attacks took place after the first anniversary of the Bali bombings. And the perpetrators may have been Islamic extremists. Well, the IJ missed the next sentence which says the government is continuing its investigation and at least 13 additional suspects remained in custody at the end of the reporting period. So first of all, the government is taking steps toward doing it. The fact that the government responded in that situation to try to take control of the situation and get the suspects, this is all an example of how the government is able and willing to control. Not only that, but this says in 2003. So we know from the State Department report that it's gotten only better since then. And it's a perfect example of the sentence from the immigration judge's decision where he stopped short of recognizing that unable and unwilling component. Basically throughout his entire decision, he does that. On page 66, he talks about in 2001 and 2002 that there were battles. He talks about the beheadings of three schoolgirls and the marketplace. And that sort of goes along with the proselytizing women that opposing counsel brought up. First of all, the proselytizing, the three women who were prosecuted, that's on page 276 of the record. That doesn't show a pattern in practice. Actually, if you read the sentence before it or after it, it actually says that the reason the government did that was for safety. Because the proselytizing, and I quote, this is from page 276, could prove disruptive. And they were actually concerned about the safety. So, and the fact that three schoolgirls were beheaded, again, it's sort of like three Sunday school teachers. It doesn't show a pattern in practice. It shows an isolated or sporadic incident. And that's what this report shows, that there were occasional incidents. But the pattern in practice has to show much more. And it also, you have to show the government isn't able and willing to control that. And that is part of the legal standard. And that is why the board, in applying the correct legal standard in terms of not only is the government committed to doing these things, but that the government has taken the concrete steps that this court recognized in Lolong, I think is very important. Your Honor also brought up the fact that her family still lives in Indonesia, which is also a very important part of the objective component of the well-founded fear, which actually goes toward both her individualized risk and the pattern in practice. Because if her sisters, she has two sisters, this is on page 127, her two sisters that live there, one's older, one's younger, very similarly situated to her. And they continue to live there. So, not only is she not being individually targeted by anyone going to them, but the population as a whole is not being persecuted. So, that goes toward both of those. I think it's very, I see that my time is. Yes, put that up. Yes. It's up now. Thank you very much. Thank you, Your Honor. Counsel brought up a good point, individualized risk. If we take a look at what has happened to Ms. Tandiono while she was living in Indonesia, you will see that during the 1998 incident, where thousands of ethnic Chinese Christians like herself were being slaughtered in the streets, she was hiding in her aunt's home. True, they may have been watching it on television as to what was taking place, but what exactly was she looking at when she was 12 years old? She was seeing people who look just like her, people who talk like her, people who. That goes to her subjective perception of events. It doesn't go to whether she would be targeted if she were to return. I understand, Your Honor. But if we take a look at the second incident, I'll come back to the first in just a second. When she was in church, her church was blown up. She may have been in another room of the church building, but the church itself was blown up. Now, this court has never held that the perpetrators need to know the exact name or the identity of the individual just that they have, in order to establish what took place. Right, but if you can't draw any link between the bombing and her specifically, then there's no evidence in the record that if she went back that somebody was looking for her. We're drawing an inference about what has happened. As we said in the law, there's no question there's some very, very difficult issues for Chinese Christians in Indonesia. But your theory is a very, very broad one. Well, Your Honor, if we take a look at the incident when she was in the car with five of her friends, and indigenous natives were pulled out. The driver of the car were beating him up while they were yelling out Chinese, Chinese, and they were banging on the windshield, cracking the windshield, and she was inside the car. And we're saying there are Chinese inside the car trying to get to her, then I think she has met the requisite level of individualized risk to have a well-founded fear of future persecution, if she were to return to Indonesia. And if the court is not willing to find pattern and practice, we would ask that the court remand this case back to the BIA, so that the BIA could take a look at her inclusion of the two separate disfavored groups, one for the ethnic Chinese and the other for the Christianity. Okay, thank you. Thank you. Counsel, we appreciate your arguments. The matter is submitted at this time.
judges: Vance, Paez, Bybee